No. 61,973

STATE OF KANSAS, *Appellee,* v. KENNETH W. HOOD, *Appellant.*

(780 P.2d 160)

Opinion filed September 11, 1989.

*Jessica R. Kunen,* chief appellate defender, argued the cause and was on the brief for the appellant.

*Mona Furst,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, *Nola Foulston,* district attorney, and *Pamela Clancy,* legal intern, were with her on the brief for the appellee.

The opinion of the court was delivered by

MILLER, C.J.: This is a direct appeal by the defendant, Kenneth W. Hood, from an order of the trial court finding that the State exercised its peremptory challenges to remove the only two black jurors for "reasons that are neutral and are acceptable under the *Batson* decision." See *Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). The order from which defendant appeals was entered at a hearing in the trial court directed by this court in the earlier appeal in this case, *State v. Hood,* 242 Kan. 115, 744 P.2d 816 (1987). Two issues are raised: that the reasons advanced by the prosecutor for striking the potential jurors were not racially neutral; and that the defendant should have been present in person at the hearing.

A brief statement of the procedural and factual background is necessary. On April 21, 1986, defendant's trial commenced in the District Court of Sedgwick County. The State was represented by Ann Swegle, an assistant district attorney. Defendant Hood appeared in person and was represented by Edward F. Britton, an assistant public defender. The problem arose during the jury selection process. In our earlier opinion, *State v. Hood,* 242 Kan. at 121, we said:

"[T]he prosecutor removed, by peremptory challenge, the only two members of defendant's race on the panel. Defense counsel interposed a timely objection. The trial court noted that in the case of the first juror, the fact that the juror 'thinks he remembers Mr. Hood from years gone by and his answer to questions concerning burden of proof [establishes that] there could be no reason to believe that his being stricken was for the purpose of racial stacking.' But the court allowed the prosecution an opportunity to address the excuse of the other juror, Mr. Richard. The prosecutor merely stated that she didn't think it necessary to respond, but due to the nature of Mr. Richard's responses in regard to questioning regarding the burden of proof, there was justification for use of a peremptory challenge.

"The first juror, Mr. Williams, a long-time resident of Wichita, stated on voir dire, 'I think I know the defendant. . . . I think I knew him when he was young; a lot younger. . . . I knew him when he was eight, nine. . . . [B]ut as far as recall of the exact circumstances, I can't.' He also responded that his prior knowledge of the defendant would in no way influence his ability to be fair and impartial. "

The trial court overruled defendant's objection and upheld the peremptory challenges by the prosecutor. Trial proceeded, and on April 24, 1986, the jury convicted the defendant of aggravated kidnapping, aggravated burglary, aggravated robbery, and rape. Six days later, on April 30, 1986, the United States Supreme Court announced its decision in *Batson v. Kentucky*.

Batson, a defendant in a Kentucky prosecution, was black. On the first day of trial, the prosecutor used his peremptory challenges to strike all four black persons on the venire, and a jury composed of only white persons was selected to try the case. The *Batson* Court explained how a defendant can establish a prima facie case of purposeful discrimination. The Court said:

"[T]he defendant first must show that he is a member of a cognizable racial group [citation omitted] and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' [Citation omitted.] Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination." 476 U.S. at 96.

At trial, defense counsel interposed a timely objection to the prosecutor's use of peremptory challenges to remove the only blacks from the trial jury. Though Hood was tried before the

*Batson* decision was announced, *Batson* is to be applied retroactively to cases pending upon direct appeal, or otherwise not final, at the time the *Batson* opinion was filed. *Griffith v. Kentucky*, 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708 (1987). When Hood's appeal came before us, the case was not final. We therefore held *Batson* applicable, and remanded the case to the trial court "not for further evidence, but for further argument before the trial court, based upon the trial record and counsel's recollection, as to the propriety of the peremptory challenges exercised by the State." 242 Kan. at 123.

Upon remand, a hearing was held before the trial judge. The State appeared by Henry Blase and Ann Swegle, assistant district attorneys. The defendant appeared by Richard Ney, the chief public defender. Edward F. Brittan, the attorney who represented defendant at trial, was no longer with the public defender's office, and neither he nor defendant were present at this hearing. Ann Swegle, the assistant district attorney who tried the case for the State, made a statement to the court as follows:

"Your Honor, the two veniremen that I struck, Mr. Williams and Mr. Richard, are the subject of course of the hearing today.

"In regard to Mr. Williams, well, first of all I should note for the court that I have had an opportunity to review a transcript of the voir dire proceedings as well as my own scribbled notes from the voir dire process. I do recall both based on my review of the notes and the transcript as well as certain other factors my examination of them to some extent. I particularly recall that because I recall the court chastising me I think about the length of my questioning about reasonable doubt with both individuals.

"In regard to Mr. Williams, certainly there were several things that I found of concern as to whether or not he could serve as a fair and impartial juror to both sides in this case. First of all he indicated in response to my questioning that he knew the defendant, Kenneth Hood. He believed that it has been quite some time ago; he believed perhaps maybe ten years ago, when the defendant had been eight or nine years old. He did not recall the nature of the acquaintance, whether he had met him through school, through family, anything like that, and did not recall whether or not he knew any of the family members. That obviously gave me some concern. I've had prior occasions where I've had potential jury members who have known either a defendant or defendant's family. I have never on any occasion allowed those individuals to stay on the jury. I exercise peremptory if not challenged for cause. That was my first item of concern.

"I think that it was, number one, noted by the court and I think Mr. Britton—although that's not reflected on the record—that there was reason for concern on my part that Mr. Williams could not serve as a fair and impartial juror due to his responses to questions I had directed to both he and Mr. Richard regarding the State's burden of proof and the concept of reasonable doubt. He explained as is

reflected in the transcript of the voir dire that he had some problem with that. He was not sure that the legal standard would be parallel to the standard that he would have in being able to determine whether or not the defendant was guilty. We talked at some length about that. And again he continually expressed to me the fact that he wasn't sure. He ultimately said yes, I think I can; something to the effect of yes, I think I can follow the law in regard to that. But it still—the nature of his responses, the specific words he used, and his hesitancy gave me cause to feel that he could not serve fairly and impartially; in fact, believe that he may indeed hold the State to a higher burden of proof than what was required by law.

"I did not feel any sort of personal animosity on the part of Mr. Williams. I thought he was very forthright and very candid in his feelings and he made his statements to me after I had gone through a process with Mr. Richard. My personal belief is that Mr. Williams could tell that Mr. Richard was having a bit of problem with the burden of proof and that's why I was continually directing questions—inarticulate perhaps as they were—about that and I had some concern about that. He brought up the fact that, you know, hey, I may have some problems; got to prove it to me to my personal satisfaction.

"After his discussion with me about that, I asked Mr. Richard again about it, and while he said that he could follow the Court's instructions—at least he said at one point I can—I think I could follow the law as the court instructs—the nature of his responses in terms of not only the way he answered the questions but his body language. I distinctly recall him sitting in the back row with his hands crossed—his arms across his chest. He seemed to have either personal hostility towards me or towards the State and that's something that you can't tell based on the words that are stated. I have tried a great number of juror cases and one of my definite practices is to evaluate a juror's ability to be impartial based on not only the words that they say but their physical responses to me, their tone of voice.

"I am well aware that sometimes people will parrot the responses that they want the attorneys to give. If they want to get off of a jury. They know the magic words to say. Mr. Richard seemed to me to be somewhat hostile towards me. He appeared to—he gave me—his words, his actions gave me the belief that perhaps he would not follow the law in regard to burden of proof.

"He again expressed that he had to be personally satisfied. He also in response particularly to Mr. Britton's questioning seemed to me to give much more affirmative responses to Mr. Britton, both in language and in physical responses, than he gave to me on my questions.

"Mr. Williams was probably about the same. But the bottom line is, your Honor, based on his words, his demeanor, his conduct, and his manner including asking me—saying to me at one point 'Just say what you're saying', I felt that he would not be fair and that is in essence, your Honor, the reasons that I struck both venirepersons."

Mr. Ney, counsel for defendant Hood, pointed out that the two jurors who were struck were black, defendant was black, and defense counsel at trial, Mr. Britton, was also black. Ney contended that the reasons advanced by the prosecutor did not establish a neutral, clear, and reasonably specific explanation for the exercise of the State's peremptory challenges to remove the

only two blacks from the jury. At the conclusion of the oral argument, the trial judge announced his decision as follows:

"THE COURT: . . . I see the problem from defendant's point of view but I see lots and lots of problems with just saying you've got to leave black panelists on juries unless you can challenge them for cause. I don't think that's what *Batson* is saying.

"At the time—and I also have reviewed parts, if not all the transcript on the voir dire. I guess at least that portion after Mr. Williams was seated. I remember sitting here thinking at the time Mr. Williams said he remembered Mr. Hood that he's gone. That's just—I don't want to say that every prosecutor in this county does it in every case because I don't think that's true, because sometimes prosecutors want those kinds of jurors when they've known a defendant recently and it's the defense that ends up striking those jurors. But after that colloquy about how long he had known him, been a long time, he was only eight or nine years old, I knew Mr. Williams was gone. I don't have any problems with Mr. Williams being excused.

"Mr. Richard is more difficult because of the time that's lapsed since the jury was selected, and I don't have an independent recollection of Mr. Richard and I asked Mr. Ney the question about the arms and the body language, all that, I do not have an independent recollection of that but I think I would have remembered that if I'd—I shouldn't say I would have remembered it. I don't think I would have remembered that unless there was something in particular that I did remember. And I guess the reason I don't have any is after the trial started we had Mr. Chism and all my memory functioned, zeroed in on Mr. Chism, and I have a very clear recollection right now of Mr. Chism saying: 'Do you mean traffic tickets or what?' And I think I remembered that even before we found out he had a complaint for that murder case, because I thought he was kind of evasive on that. So I guess I'm left with a cold record and Miss Swegle's recollection on it.

"And we do have as Mr. Ney pointed out, we do have a situation where we had a black defendant and a black defense attorney and I can believe and I guess I do believe that it's more probably true than not true that both Mr. Williams and Mr. Richard were relating better to Mr. Britton than they were to Miss Swegle. And I don't thing *Batson* goes so far—although I don't think anybody knows for sure—as to say that if an attorney honestly believes that a juror is relating to the other counsel better than they are to him or her that that juror cannot be excused. I see it done all the time in other trials and I don't think *Batson* goes so far as to say that that's—I want to use the word invidious; I don't know why—that's an invidious challenge for cause or that is a type of challenge for cause that is not allowed where the defendant is of a recognizable minority. Okay. So I'll find that both Mr. Williams and Mr. Richard were excused for—do I need to go in and dig the magic language out of the decision and put it on the record, Richard, or do you want me just to say that it was for good—I don't want to use good cause because that's got it's own—but for causes that are acceptable under *Batson*. That's the gist of what I'm saying.

"MR. NEY: The magic language is 'clear, reasonably specific, neutral, legitimate and related to the case.'

"THE COURT: It's clear, reasonable, neutral and legitimate at least specific to this case. I will find as a matter of law I do not read *Batson* or *St vs. Hood* for that

matter to require the State to have a basis to challenge for cause in this type of situation. I don't read *Batson* as saying you've got to challenge for cause before you can justify it."

Before turning to the specific reasons advanced by the State for excusing the jurors, it will be helpful to review some of the instruction given by the Court in *Batson*:

"[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause. [Citations omitted.] But the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race. [Citations omitted.] Just as the Equal Protection Clause forbids the States to exclude black persons from the venire on the assumption that blacks as a group are unqualified to serve as jurors [citation omitted] so it forbids the States to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black. The core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' race. Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirm[ing] [his] good faith in making individual selections.' [Citation omitted.] If these general assertions were accepted as rebutting a defendant's prima facie case, the Equal Protection Clause 'would be but a vain and illusory requirement.' [Citation omitted.] The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to determine if the defendant has established purposeful discrimination." 476 U.S. at 97-98.

### PRIOR ACQUAINTANCE WITH THE DEFENDANT

The first juror, Mr. Williams, stated that he knew the defendant when the defendant was much younger, perhaps eight or nine years of age. Williams could not recall the exact circumstances of his acquaintance with the defendant. He did not remember whether it was through school or through family. The prosecutor stated that she had previously had potential jury members who have known either a defendant or defendant's family, and never on any occasion had she allowed those individuals to stay on the jury. She had exercised a peremptory challenge if the juror was not excused for cause. None of the other jurors on the trial panel were acquainted with the defendant or his family.

Appellate courts in other jurisdictions have held that peremptory challenges of potential jurors who were acquainted with the defendant or defendant's family were exercised for neutral rea-

sons. See *Johnson v. State*, 512 So. 2d 819 (Ala. Crim. App. 1987); *McCormick v. State*, 184 Ga. App. 687, 362 S.E.2d 472 (1987); *Killens v. State*, 184 Ga. App. 717, 362 S.E.2d 425 (1987); *People v. Daniels*, 164 Ill. App. 3d 138, 517 N.E.2d 626 (1987). Sedgwick County is a large metropolitan area where it would appear that most jurors are not acquainted with lawyers, litigants, or witnesses. The prosecutor stated that she had tried a great number of jury cases and she followed a practice of removing from juries all persons who are acquainted with the defendant. This is a valid and neutral reason for exercising a peremptory challenge.

## THE BURDEN OF PROOF ISSUE

The prosecutor stated that she thought Mr. Richard was having a bit of a problem understanding the burden of proof. His words and his actions led her to believe that perhaps he would not follow the law in regard to the burden of proof. He seemed somewhat hostile to her; his response to defense counsel's questions seemed to be much more affirmative, both in language and in physical response, than to her questions. The prosecutor questioned all of the original panel of jurors with regard to the burden of proof, and all responded in substance that they understood that the State must prove guilt beyond a reasonable doubt. Mr. Richard and Mr. Williams were called after the panel had been examined and some jurors excused, and thus Richard and Williams were examined separately by counsel. Mr. Richard, however, asked the prosecutor to repeat her question about the burden of proof, and finally agreed that he would not make her prove her case beyond any or all doubt. Mr. Williams stated that it would have to be proven to him to his personal satisfaction and that *his* standard might be "a higher standard than what the judicial system has set up."

There was no indication that the prosecutor singled out Mr. Richard or Mr. Williams to question them at length about the burden of proof. On the contrary, she commenced by asking the same sort of question propounded to all jurors. The responses simply called for more questions until the matter was resolved. The trial court should be sensitive to the way a prosecutor questions jurors of defendant's race and later exercises peremptory challenges to remove those jurors from the trial panel. Some cases have held that the difficulties that minority members of the panel wrestled with regarding the burden of proof were not,

alone, sufficient to justify the peremptory challenges. In *Garrett v. Morris*, 815 F.2d 509 (8th Cir.), *cert. denied* 484 U.S. 898 (1987), the prosecutor submitted that his reason for striking three jurors was not based on race but instead on background, education, and knowledge to understand scientific evidence that he intended to present. The United States Court of Appeals found that, in light of the prosecutor's decision not to strike prospective white jurors who differed in no significant way, the reasons advanced by the prosecutor were a pretext for racial discrimination. That case, however, is distinguishable because in the case now before us there were no white jurors who gave the same or similar responses to the burden of proof questions as did Mr. Richard or Mr. Williams. Here, the prosecutor did not advance any explanation based on any group trait; she did not contend that black jurors generally would not be able to understand the burden of proof. She did not conduct a disparate examination of the challenged juror without cause, she did not conduct a perfunctory examination and then strike the juror, and she did not retain any white jurors who gave answers similar to those of Mr. Richard or Mr. Williams. This case is therefore distinguishable on the facts from *Garrett*. See *People v. Turner*, 42 Cal. 3d 711, 230 Cal. Rptr. 656, 726 P.2d 102 (1986); and *Slappy v. State*, 503 So. 2d 350, 355 (Fla. Dist. App. 1987). Under the circumstances as disclosed by the record in this case, we conclude that the burden of proof issue is a sufficient neutral reason for the peremptory challenge of Mr. Richard and Mr. Williams.

## BODY LANGUAGE

The prosecution also relied upon "body language." Hostility toward the prosecution, as evidenced by oral responses, tone of voice, sitting with arms crossed, leaning forward when defense counsel conducts voir dire, or leaning back while the prosecution asks questions, is a matter which the trial court may take into consideration in determining whether the prosecutor has a valid and neutral reason for striking the juror. Normally, the trial court's decision will be made immediately after voir dire and the trial court will have the benefit of having just observed the prospective jurors and having heard the questions and answers. Again, however, the trial judge must be particularly sensitive when body language, alone, is advanced as a reason for striking a juror of the defendant's race.

In *U.S. v. Forbes*, 816 F.2d 1006 (5th Cir. 1987), the prosecutor used three of his six peremptory challenges to strike black persons from the panel. The first was struck because her sons were in trouble with the law. The second was struck because the juror sat with her arms crossed during voir dire and impressed the prosecutor as being hostile. The trial judge held these reasons were sufficient to justify the challenges; the Fifth Circuit agreed, saying:

> "Under either a 'clearly erroneous' or 'great deference' standard, there is no basis for upsetting the district court's findings. The appellants admit that the prosecutor supplied an objective explanation for striking the black woman whose two sons had been in trouble with the law. . . .
>
> "The prosecutor's reasons for striking the second black venireperson were less quantifiable, but not for that reason necessarily fatally suspect. He sensed by her posture and demeanor that she was hostile to being in court and feared that she might respond negatively to the prosecution simply because the government was responsible for calling her to jury duty. After hearing this explanation, the district court, who had just presided over the voir dire, concluded that 'the challenge was exercised on the basis of racially neutral factors.' The record does not remotely suggest that the prosecutor's intuitive assumption was based on race." 816 F.2d at 1010-11.

Here, the same judge who presided at trial presided at the *Batson* type hearing. Though the judge did not have independent recall of the jurors' body language, he found the reasons advanced by the prosecutor were neutral reasons for striking the jurors on peremptory. The standard for review is abuse of discretion; clearly, the judge's ruling was not arbitrary, fanciful, or unreasonable. See *Leeper v. Schroer, Rice, Bryan & Lykins, P.A.*, 241 Kan. 241, 248, 736 P.2d 882 (1987); and *Stayton v. Stayton*, 211 Kan. 560, 563, 506 P.2d 1172 (1973). We find no abuse of discretion.

Other reasons advanced and discussed are that Mr. Richard seemed to be partial to defense counsel and hostile to the prosecutor. Mr. Richard, defendant Hood, and defense counsel were all black men. Clearly, the fact that the prospective juror and the defendant and his counsel were black is not a neutral and sufficient reason for striking that person from the jury panel. Mr. Richard's alleged hostility to the prosecutor, and his seeming good relation to defense counsel, however, were explained by the prosecutor as being based upon Mr. Richard's oral responses and his observed body language, and were not solely because of his race.

We conclude that the trial court did not err in finding that the State had valid, neutral, and nondiscriminatory reasons for the exercise of its peremptory challenges.

## DEFENDANT'S ABSENCE FROM THE REMAND HEARING

Finally, defendant contends that the trial court erred in denying the defendant's prehearing motion to be personally present at the remand hearing. K.S.A. 22-3405(1) provides, in part:

"The defendant in a felony case shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law."

In the case of *State v. Marks*, 231 Kan. 645, 647 P.2d 1292 (1982), we held that the conducting of a conference for the exercise of peremptory challenges outside the presence of the defendant was not error, and did not deny the defendant a fair trial, since the conference dealt with a matter of law. We relied on *State v. Mantz*, 222 Kan. 453, 463, 565 P.2d 612 (1977), where we said:

"The general rule clearly appears to be that a defendant's constitutional and statutory rights to be present at his trial do not encompass proceedings before the court involving matters of law. Such rights are violated only if the defendant is absent when the jury is hearing the case or where he is prevented from such other proceedings where his presence is essential to a fair and just determination of a substantial issue. [Citations omitted.]

". . . [K.S.A. 22-3405] specifically requires defendant's presence, '. . . at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, . . .' We believe this to mean that defendant must be present at all times when the jury is present in the courtroom, except where the defendant is voluntarily absent, as set forth in the statute."

Defendant argues that the issue at bar was one of fact, not of law. We remanded the case to the trial court for further proceedings, "not for further evidence, but for further argument before the trial court, based upon the trial record and counsel's recollection, as to the propriety of the peremptory challenges exercised by the State." *State v. Hood*, 242 Kan. 115, 123, 744 P.2d 816 (1987). Defendant Hood was represented at all times by counsel. The matter was before the court for argument as to whether the State's reasons for exercising peremptory challenges were "neutral." The matter was therefore primarily one of law and not of fact.

Defendant next argues that the case of *U.S. v. Thompson*, 827 F.2d 1254 (9th Cir. 1987), should control. In *Thompson*, the issue was "whether the district judge erred by permitting the Assistant United States Attorney to state her reasons to him ex parte and then ruling on the objection without divulging the reasons to defense counsel." 827 F.2d at 1257. The court discussed each of the arguments of counsel, and concluded "that the district court erred in refusing to allow defense counsel in this case to hear the government's reasons for excluding the black potential jurors and to present argument thereon." 827 F.2d at 1261. The court's conclusion is based upon the exclusion of defense counsel from the ex parte hearing. The court points out the importance of having counsel at the hearing in order that counsel may counter the government's argument and point out any deficiencies or inconsistencies. The opinion, however, does not discuss the necessity of having the defendant personally present at such a hearing. Even the dissent deals exclusively with the right of the defendant to have counsel at the hearing. The case is clearly distinguishable on the facts from the case now before us.

Of interest is the case of *United States v. Davis*, 809 F.2d 1194 (6th Cir. 1987). There the prosecution removed seven out of nine potential black jurors by exercise of peremptory challenge. The remaining two were removed for cause. Defense counsel objected, and the trial court held what is characterized in the opinion as an "in camera" hearing at which the government disclosed its reasons for striking the jurors. Neither the defendants nor defense counsel were permitted to attend that hearing. The district court, following the in camera hearing, ruled that the government's criteria were legitimate and reasonable. The United States Court of Appeals affirmed, finding that neither the Constitution nor Rule 43(a) of the Federal Rules of Criminal Procedure (which contains language similar to our K.S.A. 22-3405(1), quoted above) required defendant's presence at the hearing. The court said:

"Once the defendants had established a prima facie case of racial motivation sufficient for the district court to make an inquiry of the Government, there was nothing more defendants were required to do. Their participation was no longer necessary for the district court to make its determination. At that point, the district court was entitled to hear from the Government under whatever circumstances the district court felt appropriate." 809 F.2d at 1202.

Defense counsel at trial raised the issue and, as we noted in our

earlier opinion, it appears "that the trial court . . . found that a prima facie showing had been made." 242 Kan. at 123. When the matter came on for hearing after remand, defendant Hood was represented by counsel who was well prepared. The record reflects that Hood was ably represented at the remand hearing. This was a post-trial hearing, before a court without a jury in attendance, and was not a critical stage of the proceeding. Defendant had no statutory or constitutional right to be present in person. We think the trial court followed the preferred procedure in having defense counsel present at the hearing; ex parte or "in camera" hearings, as approved in *Davis*, should be avoided unless there appears some sound and compelling reason for proceeding ex parte. The trial court did not abuse its discretion in denying the motion. We find no error.

The judgment is affirmed.